```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

```
NINA ANDINO                  :    CIVIL ACTION
                             :
         v.                  :
                             :
PHILADELPHIA HOUSING         :
AUTHORITY                    :    NO. 05-2161
```

MEMORANDUM

Dalzell, J.                                    August 6, 2007

          Plaintiff is suing her former employer, the
Philadelphia Housing Authority, for violations of the Americans
with Disabilities Act.  Before us now is defendant's motion for
summary judgment, which we shall grant for the reasons discussed
herein.

## I.  **Factual Background**

          The Philadelphia Housing Authority ("PHA") hired Nina
Andino as a lobby monitor on September 26, 1997.  Andino Aff. ¶
4.  She worked five days a week on the second shift, 3:00 p.m. to
11:00 p.m., at various PHA housing locations around Philadelphia.
See id.; Andino Dep. 86:24-87:15, Apr. 26, 2007.

          Andino's job duties as a lobby monitor included
screening people entering secure PHA buildings, monitoring all
public safety devices (e.g., fire alarm panels and elevator alarm
panels), watching monitors, and notifying the PHA Police
Department of any illegal activity and damage to, or disruptions
at, the property.  See Def.'s Ex. B, PHA Police Dep't Directive
0-51 ("Directive") 1-2; Ex. C Resident Lobby Monitor Job
Description ("Job Description"); Andino Dep. 86:8-17.  Lobby

monitors also write regularly, keeping a handwritten log book in
which they record their names, scheduled shifts, and arrival
dates and times, as well as information about crimes or
disturbances, the activation of any safety device, any equipment
and property in the lobby monitor booth, and the condition of
security devices in the booth.  See Directive 9-11; Job
Description; Andino Dep. 86:12-15.  The typical log book entry
for an eight-hour shift takes less than one page of handwritten
notes.  See Def.'s Ex. D, Sample Log Book Entries from 2003,
2005, 2006.

This lawsuit arises from two on-the-job injuries that
Andino suffered, one to her left elbow and other parts of her
body on November 30, 2002, and the second to her right shoulder
on November 24, 2005.

### A.   November 30, 2002 Injury

On November 30, 2002, Andino worked her usual shift,
3:00 p.m. to 11:00 p.m., at PHA's Queen Lane housing development.
Just before the end of her shift, she fell while walking in the
lobby and injured her right ankle, knee, hip, and her left elbow.
See Def.'s Ex. E Accident Reports; Andino Aff. ¶ 10.  She was
taken to the hospital, examined, and released.  See Accident
Reports.

Four days after Andino fell, a doctor released her to
work light duty.[1]  See Def.'s Ex. F, PHA Medical Status Report.

---

[1] Neither party has favored us with any enlightenment
about the meaning of "light duty", a recurring locution in this
record.  According to the Social Security Administration, there
(continued...)

A week later, a doctor examined her again and released her to work without restrictions.  Id.   The temporary workers' compensation she received after the accident ended on December 12, 2002.  See Def.'s Ex. G, Notice Stopping Temporary Compensation.

Following the December 11, 2002 release, Andino saw a doctor five times in six weeks about pain in her left elbow, and he repeatedly released her to work without restrictions until January 21, 2003, when he put her on light duty.  See Def.'s Ex. H, Notes of Dr. Mandarino.  PHA then assigned her to light duty work that involved no writing at the front desk at the 2012 Chestnut Street building ("2012 Chestnut"), which houses PHA's business offices and closes at the end of the business day.

---

[1](...continued)
is a definition for the term "light work", and it:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Sometimes Andino worked in the radio room, PHA's communications center located behind the front desk at 2012 Chestnut, assisting the dispatchers by answering telephones or monitoring alarm systems.

Commander Daniel Rosenstein, a former commander for PHA, had "a vague recollection" that Andino was at 2012 Chestnut because of "something to do with a disability involving her hand or her elbow, something along those lines."  Rosenstein Dep. 19:14-18, Apr. 25, 2007.  According to him, PHA police officers sometimes worked in the radio room in a light duty capacity because of a "service connected disability or injury."  Id. at 25:9-20.  He also said he had no reason to believe that PHA treated its civilian employees differently from its police officers.  Id. at 45:2-12.

Sergeant (now Lieutenant) Walter Jones was in charge of the radio room, and he said that the most police officers he ever had working on light duty in the radio room was "[m]aybe four." Jones Dep. 16:11-15, Apr. 25, 2007.  Also, when asked at his deposition if "there were times when [he] didn't have coverage at 2012 on the second shift and on the third shift," he answered, "Yes."  Id. at 69:9-12.

Stacey Thomas, who has been PHA's administrative officer in the Human Resources Department ("HR") since early 2006, said that PHA had placed twenty to thirty employees on light duty service from about April 2002 to April 2007.  Thomas Dep. 34:13-17, Apr. 5, 2007.  Thomas also said that since about April of 2006, PHA had granted two of four requests for light duty work as an accommodation.  Id. at 72:22-73:8.  Before Thomas became the administrative officer, Barbara Turzanski held that

position and was in charge of reasonable accommodation requests from 2003 until March of 2006.  Turzanski Dep. 12:18-22, 17:11-16, 43:16-24, May 11, 2007.  An HR chart shows that thirteen employees requested accommodations while Turzanski was in charge, and Andino was not one of them.  See id. at 21:4-9, 79:8-17; Pl.'s Ex. H, Reasonable Accommodation Requests Chart.  Turzanski never discussed Andino's situation with Thomas or Andino's supervisors.  Turzanski Dep. 79:18-80:17.

On February 4, 2003, a doctor released Andino to work full duty.  See Notes of Dr. Mandarino.  She returned to the regular lobby monitor rotation and was assigned to PHA locations throughout the city.  Over the next six weeks, doctors examined her several times and released her to work full duty each time.  See Def.'s Ex. K, Doctors' Notes.  After her deposition, Andino submitted an affidavit claiming that by early 2003 she had "fairly severe pain" in her left elbow if she wrote more than a few words, so in March she tried writing using both hands, and by mid-2003 she was writing only with her non-dominant right hand because of pain in her left elbow.  Andino Aff. ¶ 12.[2]

_____

[2] This post-deposition document -- appended to Andino's response to PHA's summary judgment motion -- directly implicates the "sham affidavit" doctrine Judge Greenberg canvassed for a panel of our Court of Appeals in Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004).  In brief, our Court of Appeals has adopted a contextual analysis for such deposition-contradicting affidavits, permitting consideration of them where, as in Baer, "there is independent evidence in the record to bolster an otherwise questionable affidavit."  Id. at 625.  We therefore shall note the assertions of the post-deposition affidavit and then analyze them in the context of our discussion of the record as to each particular averment in the affidavit.

Andino reported that her supervisor, Sergeant (now Lieutenant) Cunningham, sent her home on May 20 and 21, 2003 and two or three times in October of 2003, days when she could not write.  Andino Dep. 293:8-294:24, 310:19-20, May 10, 2007.  Cunningham confirmed that he sent Andino home early a few times because she could not write and was in pain.  Cunningham Dep. 29:7-13; 81:6-9.

Andino now avers that she told Cunningham she was in pain and needed help writing and that he gave no suggestions, told her she would not work if she could not write, and called her a "liability."  Andino Aff. ¶¶ 17-18.[3]  When he sent her home in May of 2003, allegedly without citing her pain as the reason, she objected because she did not want to go home.  Id. at ¶ 19.  He told her to contact Stacey Thomas in HR.  Id.  She did so and told Thomas about the pain she felt when writing with her left hand and her need for help.  Id.  She contends that Thomas offered no alternatives and told her she would not be paid if she went out.  Id.  Thomas does not recall having this conversation, learning that Sergeant Cunningham sent Andino home, or having Andino tell her about problems with writing.  Thomas Dep. 55:14-18, 57:1-9, 97:15-20.  Andino did not work and was not paid -- except for a small sum for sick pay or personal leave -- for about three weeks in May and June of 2003.  Andino Aff. ¶ 20; Def.'s Ex. L, PHA Payroll Report 5.

---

[3] Andino also complained to Commander Williams on February 21, 2003 when Sergeant Cunningham threatened to change her shift because she had been late to work.  See Def.'s Ex. J, Andino Memo to Comm. Williams, Feb. 21, 2003.  She stated that a change in shift would be a hardship.  Id.

On June 10, 2003, a day after Andino spoke with a representative of her union, PHA placed her on light duty at the radio room at 2012 Chestnut.  See Def.'s Ex. M, M. Subick E-mail, June 9, 2003; Andino Aff. ¶ 21.  She worked there until early October of 2003, shortly before the scheduled surgery for her left elbow.  Andino Aff. ¶ 21.  When her surgery was postponed, she was directed to report back to Sergeant Cunningham, who told her she would have to work full duty because PHA's doctor released her to full duty status.  Id.  A few days later, Andino worked at the Queen Lane housing development with another lobby monitor, Sandra Young, who agreed to do all the writing in the log book, but an unidentified person told Andino that she would also have to write.  Id. at ¶ 23.

Andino told her supervisor, Ahmad Muhammad, about the pain she felt when writing, and once or twice that October, after he talked with Sergeant Cunningham on the telephone, Muhammad told her to go home because she was using her non-dominant right hand to write.  Id. ¶ 24.  Andino and her supervisor apparently disagreed as to whether her writing was legible.  Id.  On October 14, 2003 Sergeant Cunningham sent her home because she "could not perform the Lobby Monitor job."  Id. ¶ 25.

Andino submitted a doctor's note dated October 14, 2003 placing her on light duty.  See Def.'s Ex. N, Note of Dr. Williams, Oct. 14, 2003.  On October 16, 2003, PHA again placed her on light duty status in the radio room.  See Def.'s Ex. O, M. Subick E-mail, Oct. 16, 2003.  She continued to work in a light duty capacity until March of 2004.  Andino Aff. ¶ 26.

On March 17, 2004, Andino underwent surgery on her left elbow.  A doctor examined her on July 28, 2004, reviewed her job

description, and released her to full duty at her job as a lobby
monitor.  The doctor noted that while she could not write with
her left hand, she had "demonstrate[d] the ability to write with
her right hand."  See Def.'s Ex. P, Letter Report of Dr.
Kirkpatrick, July 28, 2004.  On July 14[4] and August 26, 2004,
Stacey Thomas notified Andino that she was released to full duty.
See Def.'s Ex. P, Thomas Letters.  Following both letters, Andino
allegedly called Thomas and informed her that "stiffness and
pain" in her elbow prevented her from working full duty and
writing, but she was "would be willing to work light duty," which
she understood to be an assignment at 2012 Chestnut.  Andino Dep.
182:7-184:16.  Thomas told her that PHA would file a court
petition, id. at 183:4-184:7, and at some point PHA did petition
to cut off her workers' compensation benefits, Andino Aff. ¶ 27.

        Andino did not return to work in response to the
letters or full duty release.  She received workers' compensation
payments from the time of her surgery in March of 2004 through
December 2005.  See Def.'s Ex. Q, Workers' Compensation Payment
History.  PHA's payroll records also show that it paid her from
December of 2002 until her surgery.  See Payroll Report.

## B.   November 24, 2005 Injury

        On November 24, 2005, Andino returned to work -- for
the first time since March of 2004 -- for a trial period agreed
to in a settlement conference before this Court.  Within the

---

        [4] We note that the July 14, 2004 letter references an
attached release, but the only release in PHA's exhibit is dated
two weeks later.  PHA has not explained this discrepancy, but it
is immaterial to our decision.

first two hours of her first day back, Andino claims she injured her right shoulder by pushing the button used to admit visitors to the building.  See Andino Dep. 80:18-81:6; Def.'s Ex. R, Injured Employee Report, Dec. 2, 2005.  She returned to work the next day, but another lobby monitor answered the telephone, wrote in the log book, and let people into the lobby.  See Injured Employee Report.  A day later Andino went to the emergency room and was treated for tendinitis, and the next two days were her regular days off.  Id.

During the next several weeks, Andino worked some days and took others off as sick days.  See Payroll Report 12-13.  On December 5, 2005, a doctor at the Industrial Healthcare Center ("IHC") at Northeastern Hospital, a PHA healthcare provider, examined Andino and diagnosed her with a sprained right shoulder.  See Def.'s Ex. T, Notes of Dr. Williams, Dec. 5, 2005.  IHC released Andino for "light work."  Id.  The next day PHA assigned Andino to work at the Blumberg Apartments in a light duty capacity.  See Def.'s Ex. U, Memo from Resident Lobby Monitor Supervisors, Dec. 6, 2005.  PHA instructed Andino not to use her right hand to carry, pull, crawl, reach, drive, and to only occasionally bend, squat, twist or kneel.  Id.

From December of 2005 through March of 2006, several doctors examined Andino and all released her to work in a light duty capacity.  See Def.'s Ex. V, IHC Treatment Notes.  PHA kept her on light duty status until May of 2006, during which time her work typically consisted of working in the regular lobby monitor booth with another lobby monitor who assisted her with the work.  On some shifts that Andino worked alone, she wrote nothing in the log book.  See Andino Dep. 215:16-216:10.

On May 22, 2006, IHC gave Andino a note stating that she was to remain at home until her June 27, 2006 surgery on her right shoulder.  <u>See</u> Def.'s Ex. X, IHC Treatment Notes, May 22 & 26, 2006; Andino Dep. 192:14-24.  Although the surgery was postponed, Andino did not return to work.  PHA continued to pay her until she exhausted her paid leave on July 27, 2006.  <u>See</u> Payroll Report 17-19.  PHA laid Andino off on January 23, 2007 due to cuts in funding.  <u>See</u> Def.'s Ex. Y, PHA Letter, Jan. 22, 2007, & Press Release ("PHA laying off 22% of workforce").

Andino filed petitions for workers' compensation benefits for both workplace injuries, in which she represented that she was totally disabled.  <u>See</u> Def.'s Ex. Z, Andino's Claim Petitions.

## C.   <u>Abilities and Limitations</u>

After her injury in November 30, 2002 and until the surgery of March 17, 2004, Andino, without assistance, was able to feed herself, brush her teeth, take showers, bathe herself, use the restroom, put on her lower undergarments, and clip her toenails.  Andino Dep. 46:6-47:22, 53:12-14, 125:15-19.  She could make beds, use the vacuum cleaner, and prepare light meals, such as soup and sandwiches, using her right hand.  <u>Id.</u> at 50:5-8, 58:3-6, 85:6-9, 125:24-126:24.  She could also take public transportation to work, drive a borrowed car to work, walk to the grocery store, and lift some grocery items, such as a half gallon of milk, a package of blueberries, or individual pieces of fruit. <u>Id.</u> at 51:8-12, 51:24-52:5, 52:17-22, 54:18-22, 57:1-58:6.

Since the November 2002 injury, Andino has needed assistance, usually from her daughter or granddaughter who live

with her, to put on her outer garments and brassiere, lift
heavier grocery items that require two hands, and clip
fingernails on her right hand.  Id. at 47:14-22, 50:17-51:16,
53:3-11.  She also does not do laundry because she cannot use two
hands to carry it.  Id. at 58:7-18.  In her post-deposition
affidavit, Andino contends that since the time of or shortly
after her November 2002 injury she has not been able to clean,
sweep or mop her house; collect and take out trash; wash clothes
and carry laundry; open jars; cook with "pots and pans"; carry
groceries home from the supermarket; or reach and remove items
below her waist or above her shoulders without assistance.
Andino Aff. ¶ 16.

   In her affidavit, Andino claims that the pain in her
left elbow has been present since early 2003, has increased, and
is not relieved by pain medication.  Id. at ¶ 11.  She further
claims that, by some unspecified point in 2004, she could no
longer relieve the cramping and pain that occurred in her right
hand when she wrote with it.  Id. at ¶ 12.  "[S]ince about 2004"
she has not been able to lift more than one pound with her left
arm or lift such weight above her shoulder.  Id. at ¶ 15.  Since
some time after her right shoulder injury in November of 2005,
she has been able to lift only about one pound with her right
arm, can write only a few words with that hand, and "can do
almost no manual tasks."  Id. at ¶ 32.

### D.   **Procedural History**

   In October of 2003, Andino filed charges of
discrimination against PHA with the Philadelphia Commission on
Human Relations ("PCHR") and the Equal Employment Opportunity

Commission ("EEOC").  <u>See</u> Andino Aff. ¶ 33; Def.'s Ex. AA, PCHR
Complaint & EEOC Charge.  After receiving a notice of right to
sue, she filed a <u>pro se</u> complaint in this Court on May 12, 2005,
which alleged that PHA discriminated against her based on
Sergeant Cunningham's actions.[5]  In response to Andino's request
for the appointment of counsel, on July 21, 2005 we appointed
counsel to represent her.  After a series of failed attempts to
settle this matter, we now have before us PHA's motion for
summary judgment, Andino's response thereto, and PHA's reply.

## II.  <u>Legal Standard</u>[6]

---

[5] In her complaint, Andino does not specify that she is
bringing her action pursuant to the Americans with Disabilities
Act ("ADA"), 42 U.S.C. § 12101, <u>et</u> <u>seq.</u>, but the parties do not
dispute that her claims arise under the ADA.

[6] Summary judgment is appropriate if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  The moving party
bears the initial burden of proving that there is no genuine
issue of material fact in dispute.  <u>Matsushita Elec. Indus. Co.
Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986).  Once
the moving party carries this burden, the nonmoving party must
"come forward with 'specific facts showing there is a genuine
issue for trial.'"  <u>Id.</u> at 587 (quoting Fed. R. Civ. P. 56(e)).
The nonmoving party cannot rely on speculation and conclusory
allegations to satisfy its duty on summary judgment.  <u>Ridgewood
Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 252 (3d Cir.
1999).  The task for the Court is to inquire "whether the
evidence presents a sufficient disagreement to require submission
to the jury or whether it is so one-sided that one party must
prevail as a matter of law."  <u>Liberty Lobby</u>, 477 U.S. at 251-52;
(continued...)

Andino alleges that PHA violated the Americans with Disabilities Act ("ADA") by discriminating against her due to her disability.  PHA asserts that Andino cannot make a <u>prima facie</u> case of discrimination.  She counters that there are material questions as to whether she was actually disabled and whether PHA regarded her as disabled, and she further contends that PHA violated the law regarding reasonable accommodation.  She seeks damages for the times when Sergeant Cunningham sent her home in May and October 2003, and when PHA allegedly failed to accommodate her in mid-2004 until late November 2005 and then again from May 2006 to mid-January 2007.

Before turning to those arguments, we first address PHA's contention that we should not consider Andino's post-administrative charge allegations.[7]

### A.   Post-Administrative Charge Allegations

Andino filed charges of discrimination against PHA with the PCHR and EEOC in October of 2003.  PHA asks us not to consider events arising after Andino filed her administrative charge allegations because the PCHR's investigation, conducted pursuant to Andino's unamended October 20, 2003 complaint, did not include those matters.  PHA contends that Andino's allegations are a series of discrete acts, not a continuing

---

[6](...continued)
<u>Tabas v. Tabas</u>, 47 F.3d 1280, 1287 (3d Cir. 1995) (en banc).

[7] PHA also argues that Andino's retaliation claim is untimely, but we need not address that issue since Andino has expressly abandoned that claim here.  <u>See</u> Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") 19 n.12.

violation.  Andino, in turn, asserts that the acts of
discrimination she alleges in this lawsuit are fairly within the
scope of the agency charges she filed in October of 2003 and the
investigation that followed.

Our Court of Appeals has explained the standard we must
apply in such matters:

> Where discriminatory actions continue after the filing
> of an EEOC complaint . . . the purposes of the
> statutory scheme are not furthered by requiring the
> victim to file additional EEOC complaints and re-
> starting the 180 day waiting period.  This court has
> recognized this fact in permitting suits based on new
> acts that occur during the pendency of the case which
> are fairly within the scope of an EEOC complaint or the
> investigation growing out of that complaint, without
> requiring the victim to file additional EEOC complaints
> and wait another 180 days to sue. . . . .  The relevant
> test in determining whether appellant was required to
> exhaust her administrative remedies, therefore, is
> whether the acts alleged in the subsequent Title VII
> suit are fairly within the scope of the prior EEOC
> complaint, or the investigation arising therefrom.

Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).

The purposes of the statutory scheme would not be
furthered by requiring Andino to file another administrative
charge and restart the waiting period because, on the record set
forth above, the allegedly discriminatory acts she identifies are
fairly within the scope of her administrative charges.  We shall
therefore deny PHA's request.

## B.   Prima facie case of discrimination

PHA contends that Andino does not make out a prima
facie case of discrimination.  To establish a prima facie case of

discrimination under the ADA, a plaintiff must prove that: (1) she is disabled within the ADA's meaning; (2) she is otherwise qualified to perform the essential functions of the job, with or without the employer's reasonable accommodations;[8] and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  <u>Gaul v. Lucent Technologies, Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998).

## 1.   <u>Disability</u>

To have a "disability" within the meaning of the ADA, one must: (a) have a physical or mental impairment that substantially limits one or more of her major life activities; (b) have a record of such an impairment; or (c) be regarded as having such an impairment.  42 U.S.C. § 12102(2).  Andino contends, and PHA denies, that she was both actually disabled or PHA "regarded [her] as" disabled.  We consider both arguments in turn.

---

[8] The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "The determination of whether an individual with a disability is qualified is made at the time of the employment decision," not at the time of the lawsuit.  <u>Gaul v. Lucent Technologies, Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998) (quoting 29 C.F.R. pt. 1630, App. at 353-54); <u>see also</u> <u>Turner v. Hershey Chocolate USA</u>, 440 F.3d 604, 611 (3d Cir. 2006).

### a.  __Actually Disabled__

The ADA does not define the terms relevant to the
"disability" definition, such as "major life activities" or
"substantially limits," so the EEOC Regulations issued pursuant
to 42 U.S.C. § 12116 to implement Title I of the Act will guide
us.  Deane v. Pocono Medical Center, 142 F.3d 138, 143 n.4 (3d
Cir. 1998) (en banc) (citations omitted).[9]  "Major life
activities" are "functions such as caring for oneself, performing
manual tasks, walking, seeing, hearing, speaking, breathing,
learning, and working."  29 C.F.R. § 1630.2(i).  "Substantially
limits" means:

> (i) Unable to perform a major life activity
> that the average person in the general
> population can perform; or (ii) Significantly
> restricted as to the condition, manner or
> duration under which an individual can
> perform a particular major life activity as
> compared to the condition, manner, or
> duration under which the average person in
> the general population can perform that same
> major life activity.

29 C.F.R. § 1630.2(j)(1).

To assess whether one is "substantially limited in a
major life activity," we consider "(i) The nature and severity of
the impairment; (ii) The duration or expected duration of the

---

[9] Sutton v. United Air Lines, Inc., 527 U.S. 471
(1999), leaves some question as to what deference such EEOC
regulations are entitled to, but neither of the parties
challenges the reasonableness of the EEOC's regulations with
respect to the relevant terms here, so we need not reach this
issue.  See Williams v. Philadelphia Housing Authority Police
Dept., 380 F.3d 751, 762 n.7 (3d Cir. 2004).

impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).  Notably, "[t]o rise to the level of a disability, an impairment must <u>significantly restrict</u> an individual's major life activities.  Impairments that result in only mild limitations are not disabilities." <u>Kelly v. Drexel University</u>, 94 F.3d 102, 107 (3d Cir. 1996) (quoting 2 <u>EEOC Compliance Manual</u> § 902, at 902-19) (emphasis added).  In other words, the ADA affords protected status "only [for] extremely limiting disabilities." <u>Marinelli v. City of Erie, Penn.</u>, 216 F.3d 354, 362 (3d Cir. 2000).

The parties dispute whether Andino was substantially limited in four major life activities: (1) caring for herself; (2) performing manual tasks; (3) lifting; and (4) working.  We consider each activity in turn, beginning with whether Andino could care for herself.

After her November 2002 fall, Andino needed no assistance to feed herself, take showers, bathe herself, brush her teeth, use the restroom, and put on lower undergarments.  She could prepare some meals and do some housework, such as making beds and running the vacuum cleaner.  She could also drive a car, take public transportation, walk to the grocery store, and lift some basic grocery items.  In short, she could maintain hygiene, prepare meals, do some household chores, and get herself around.  There are no facts on record showing that she was unable to continue performing those tasks until now.

Andino's post-deposition affidavit makes many broad claims about "trouble caring for [her]self" dating back to "the time of or shortly after" her November 2002 injury, Andino Aff. ¶

17

16, but her specific deposition testimony contradicts those
claims.  For instance, her affidavit states that she has not been
able to "clean" her house, Andino Aff. ¶ 16, but she testified
that she could vacuum with her right hand[10] and did not dust
because of her allergies, as opposed to physical constraints,
Andino Dep. 50:5-8, 53:15-54:10.  Contrary to her claim that she
has been unable to cook with "pots and pans," Andino Aff. ¶ 16,
she testified that she could cook soup, Andino Dep. 125:24-126:5.
She claims, too, that she has not been able to "lift or carry
laundry" or "wash clothes."  Andino Aff. ¶ 16.  When asked at her
deposition why she could not do laundry pre-November 2005 using
her then-uninjured right hand, she said she "needed two hands to
carry it."  Andino Dep. 58:15-18.  Assuming she can now lift
about a pound with each hand (and pre-November 2005 had no
constraints on her right arm), she does not explain why she is
incapable of placing pieces of clothing into a machine, pouring
in a cup of detergent, and pressing a button to start the
machine.  While a basket full of clothes may be too heavy for her
to carry, her unsubstantiated assertion that she cannot "wash
clothes" is inconsistent with the record.  Similarly, her
asserted inability to take out trash or carry groceries home from
the store, Andino Aff. ¶ 16, does not specify whether that
limitation applied only to her left arm before November of 2005
or why she could not then use her right arm to carry bags with
typical weight.  Finally, her affidavit's claim that she "can do

---

[10] Andino's brief cites to her affidavit for the claim
that she cannot vacuum, see Pl.'s Resp. 6, 12, but because her
affidavit does not mention vacuuming, we shall not credit that
assertion even aside from its "sham affidavit" difficulties.

almost no manual tasks," Andino Aff. ¶ 32, is untenable given the many things she can do to care for herself and her home.

Andino's lack of precision concerning alleged limitations is unacceptable.  See Greb v. Potter, 176 Fed. Appx. 260, 262-63, 2006 WL 1004874, at *2 (3d Cir. Apr. 18, 2006) (holding that -- absent evidence of severity of limitations, such as a doctor's testimony -- assertions in plaintiff's declaration of trouble bathing, dressing, reaching, lifting, sleeping, and maintaining personal hygiene without assistance were insufficient to withstand summary judgment); Brandon v. Klingensmith Healthcare, Inc., No. 03-1963, 2005 WL 3434141, at *4 (W.D. Pa. Dec. 13, 2005) (granting summary judgment for defendant where plaintiff claimed she could not cook, clean, dress, or undress at times, yet did not provide supporting affidavits from family members, health care workers, friends, or anyone who assisted her with activities or witnessed her difficulties).

Once PHA cited record evidence showing she could care for herself, Fed. R. Civ. P. 56(e) required Andino to come forward with "specific facts" showing otherwise, not merely imprecise assertions failing to specify the extent of an alleged limitation.  We focus here on specific facts but the affidavit's vague, self-serving, and unsubstantiated claims constitute the antithesis of "specific facts."  Andino's own testimony shows she can do some cleaning, cooking with pots and pans, and manual tasks, contrary to the esprit de l'escalier of her affidavit. Under the "sham affidavit" jurisprudence, supra note 2, the affidavit cannot on this point be regarded as corroborative or made in good faith, see, Baer, 392 F.3d at 625-26 (citing with approval Delaney v. Deere & Co., 219 F.3d 1195, 1196 n.1 (10th

Cir. 2000), which requires that, to be considered, the new evidence must "furnish a good faith basis for the inconsistency").

To be sure, Andino has _some_ limitations.  She needs some help dressing and cannot do certain housework, such as sweeping or mopping, opening jars, or lifting or carrying items requiring two hands.  But doing housework or cleaning is deemed a major life activity only to the extent that it is needed for one to live in a healthy or sanitary environment.  _Marinelli_, 216 F.3d at 362-63.  Andino's testimony shows she can do basic tasks to keep her home sanitary and herself clean and fed.  On such facts, Andino is not substantially limited in the major life activity of caring for herself.

The central inquiry when addressing "manual tasks" is "whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." _Toyota Motor Mfg., Kentucky, Inc. v. Williams_, 534 U.S. 184, 200-01 (2002).  Relevant manual tasks include household chores, bathing, and brushing one's teeth.  _Id._ at 202.

Without any assistance, Andino can bathe, brush her teeth, and perform a number of basic household chores.  As already noted, we shall not give Rule 56 weight to the vaporous and unsubstantiated assertions such as her conclusory post-deposition claim -- unsupported by a scintilla of medical evidence -- that she "can do almost no manual tasks."  _See_ _Greb_, 176 Fed. Appx. at 262-63.  Andino has limitations as to some household chores and her writing ability, and her affidavit claims roughly a one-pound weight limitation for each arm -- for

20

her left arm since "about 2004" and for her right arm since some indeterminate period after her November 2005 injury.  These limitations, however, do not rise to the level of significantly restricting her ability to perform manual tasks central to her daily life.

Our Court of Appeals has held that lifting, in addition to being a manual task, is also a separate major life activity. See Marinelli v. City of Erie, Penn., 216 F.3d 354, 363-64 (3d Cir. 2000) (holding ten-pound limitation was not substantially limiting in ability to lift).  As noted, Andino, without any medical support, diagnoses herself with one-pound lifting limits arising "about 2004" and post-November 2005, for her left and right arm, respectively.  Notably, this claim is without corroboration from any medical record.[11]  She makes no claim, and cites no evidence, that she had a one-pound weight restriction on her left arm when Cunningham sent her home in 2003 -- at which time her right arm was wholly unimpaired -- so she was not substantially limited in the major life activity of lifting

_____

[11] Indeed, on this point Andino's affidavit constitutes the paradigmatic "sham affidavit" contemplated in the jurisprudence discussed in Baer v. Chase, cited and described supra at note 2.  Within the four corners of this affidavit, even as supplemented by the deposition testimony, it would seem beyond dispute that Andino's testimony as to any concrete physical limitation such as the putative one-pound weight limitation would be inadmissible as far beyond permissible lay opinion testimony under Fed. R. Evid. 701.  It also finds no corroboration in any of the twenty-two medical documents of record.  Indeed, if "light duty" means what "light work" does to the Social Security Administration, see supra note 1, then Andino's inadmissible lay opinion would contradict repeated doctors' release directions to PHA.

during PHA's allegedly discriminatory acts in 2003.  Moreover, her "about 2004" claim regarding her left arm limitation is simply too vague to credit, since it is equally likely to mean the asserted one-pound weight limitation began in 2004 or 2005. Andino has therefore not created a genuine issue of material fact as to whether she was substantially limited during the allegedly discriminatory acts that happened through November of 2005.  Even if Andino's post-deposition claim regarding lifting is not a "sham" under the jurisprudence, we would find that there is, at most, an issue of fact as to whether she was substantially limited in the major life activity of lifting only during PHA's alleged refusal to reasonably accommodate her from May 2006 to mid-January 2007.

Finally, Andino claims to have been substantially limited as to working from the time of her second injury in late November 2005 until January 2007.  We limit our inquiry to that period since she does not make this argument regarding PHA's earlier allegedly discriminatory acts.

As to working:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).  The EEOC identifies several factors to consider, including the geographical area reasonably accessible to the person, "the number and types of jobs utilizing

similar training, knowledge, skills or abilities, within that
geographical area, from which the individual is also
disqualified," as well as a broad range of jobs in various
classes.  29 C.F.R. § 1630.2(j)(3)(ii)(A), (B), (C).  As the
Supreme Court summarized:

> To be substantially limited in the major life
> activity of working, then, one must be
> precluded from more than one type of job, a
> specialized job, or a particular job of
> choice.  If jobs utilizing an individual's
> skills (but perhaps not his or her unique
> talents) are available, one is not precluded
> from a substantial class of jobs.  Similarly,
> if a host of different types of jobs are
> available, one is not precluded from a broad
> range of jobs.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999).[12]

Andino submits the expert report of Steve Bast, a
Vocational Evaluator, who opines that post-injury Andino is
"significantly restricted in the ability to perform both a class
of jobs and a broad range of jobs in various classes."  See Pl.'s
Ex. B, Bast Report, Apr. 27, 2007, at 8.  Bast bases his
conclusion on statistical calculations which he made using
information from the report of Sharon Levine, a rehabilitation

---

[12] The Court in Sutton also noted the EEOC's reluctance
to define "major life activities" to include working and its
suggestion that "working be viewed as a residual life activity,
considered, as a last resort, only '[i]f an individual is not
substantially limited with respect to any other major life
activity.'"  527 U.S. at 492 (quoting 29 C.F.R. pt. 1630, App. §
1630.2(j) (1998) (emphasis added)).  The Court "[a]ssum[ed]
without deciding that working is a major life activity and that
the EEOC regulations interpreting the term 'substantially limits'
are reasonable," id., so we do the same.

expert who interviewed Andino and administered vocational tests
to her.  Id. at 1; Pl.'s Ex. A, Levine Report, Apr. 25, 2007, at
1.  Bast derives his results from the combined effects of
Andino's two injuries.

PHA contends that Andino was not precluded from a broad
range of jobs at the times of the alleged discriminatory acts,
but it has not submitted an expert report to rebut Bast's opinion
or offered other evidence that discredits his report.  Andino has
therefore created a genuine issue of material fact as to whether
she was substantially limited in the major life activity of
working from late November 2005 until January 2007.

In sum, with respect to the first element of a prima
facie case of discrimination, we will for purposes of this motion
assume there exists a genuine issue of material dispute for the
major life activity of "lifting" for the May 2006 to mid-January
2007 period, as well as the major life activity of "working" for
the late-November 2005 through January 2007 period.  But as we
shall show below, Andino cannot survive summary judgment on the
second element of a prima facie case of discrimination, so she
cannot sustain her disability claim.

## 2.   "Regarded as" Disabled

PHA contends that Andino cannot show it regarded her as
disabled within the meaning of the ADA.  One is "regarded as"
disabled if she:

> (1) Has a physical or mental impairment that
> does not substantially limit major life
> activities but is treated by a covered entity
> as constituting such limitation;

24

> (2) Has a physical or mental impairment that
> substantially limits major life activities
> only as a result of the attitudes of others
> toward such impairment; or
> (3) Has none of the impairments defined in
> paragraph (h) (1) or (2) of this section but
> is treated by a covered entity as having a
> substantially limiting impairment.

29 C.F.R. § 1630.2(l).  "[T]he mere fact that an employer is
aware of an employee's impairment is insufficient to demonstrate
either that the employer regarded the employee as disabled or
that that perception caused the adverse employment action."
Kelly v. Drexel University, 94 F.3d 102, 109 (3d Cir. 1996).

Andino contends that PHA regarded her as disabled,
apparently because of the physical impairment of her left elbow
and later her right shoulder.  We assume here that Andino is
physically impaired, but under the ADA any impairment must
"substantially limit[] one or more of [her] major life
activities."  42 U.S.C. § 12102(2)(A).  Andino fails to identify
which "major life activity" she believes is at issue for this
claim.  Based on the evidence she cites, and absent any clear
indication from her, we can only assume that she means PHA
regarded her as disabled as to "working."

A "regarded as" claim for working must show that the
employer regards the employee as having a substantially limiting
impairment, Sutton v. United Air Lines, Inc., 527 U.S. 471, 493
(1999), and "[t]he inability to perform a single, particular job
does not constitute a substantial limitation in the major life
activity of working," 29 C.F.R. § 1630.2(j)(3)(i).  Thus, for
Andino to carry this claim, PHA must have regarded Andino as

disabled from a class of jobs, and not just her lobby monitor
position.

Andino lists various reasons that are said to show PHA
regarded her as disabled.  She first points to Commander
Rosenstein's testimony that police officers sometimes worked at
the radio room in a light duty capacity because of a service
connected disability or injury and that he knew of no reason PHA
would treat its civilian employees differently from its police
officers.  Second, Andino contests PHA's assertion that Sergeant
Cunningham sent her home because of pain, claiming that he only
sent her home a few times even though she repeatedly told him she
needed help writing.  He also allegedly did not mention pain as a
reason for sending her home in May of 2003.  Third, the IHC
doctor sent her home in May of 2006.  Fourth, Stacey Thomas said
that since about April of 2006 PHA had twice given Andino light
duty work in response to a request for accommodation.  Finally,
Andino claims that PHA did not pay her when it sent her home,
refused at times to give accommodations she requested, and
petitioned to cut off her workers' compensation benefits because
she did not return to full duty status.  In sum, Andino contends
that this record shows a material dispute as to PHA's motivation
for its conduct.

PHA asserts that the record reveals its punctilious
compliance with Andino's doctors' notes concerning when she could
work full or light duty, thus showing that PHA regarded Andino as
able to work wherever and whenever it assigned her.  There are,
however, certain times -- such as when Sergeant Cunningham sent
her home in 2003 -- for which there is a material dispute as to
whether PHA regarded Andino as unable to sufficiently fulfill the

26

lobby monitor's job requirements.  But even if PHA believed
Andino's impairment prevented her from fulfilling one essential
element (_i.e._, writing) of a lobby monitor position, its belief
as to her inability to work that <u>single</u> <u>job</u> does not support her
claim that PHA regarded her as having an impairment that
substantially limited her in the major life activity of working.
The inability to do a particular job is not "a substantial
limitation in the major life activity of working."  29 C.F.R. §
1630.2(j)(3)(i); <u>see</u> <u>also</u> <u>Sutton</u>, 537 U.S. at 492-93 (holding
that severely myopic plaintiffs rejected for employment as
commercial airline pilots failed to allege adequately that
airline regarded their poor eyesight as an impairment
substantially limiting them in "working" because they alleged
only that airline regarded their poor vision as precluding them
from a single job).  A lobby monitor is <u>one</u> job, not a class of
jobs, and the record does not suggest that PHA regarded Andino as
disabled from any job other than that of a lobby monitor who had
to keep a written log.  Andino cannot sustain a "regarded as"
claim.

        **C.**    **Reasonable Accommodation**

      PHA asserts that, even if Andino were disabled within
the meaning of the ADA, she cannot satisfy the second element of
a <u>prima</u> <u>facie</u> discrimination claim.  To do so, she would have to
show that she was otherwise qualified to perform the essential
functions of the lobby monitor job, with or without reasonable
accommodations from PHA.  Andino contends there are material
disputes as to whether she could have done the job with a

27

reasonable accommodation -- one that transferred her to 2012 Chestnut or helped her write -- or whether she could have done the job without writing at all.  She also charges PHA with failing to engage in good faith in an interactive process to find a reasonable accommodation, apparently basing this allegation on 2004 events.  Her arguments are unpersuasive.

Under the ADA, an employer discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(5)(A).  Determining the appropriate reasonable accommodation may require the employer "to initiate an informal, interactive process with the qualified [employee]," and "[t]his process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3). The EEOC's interpretive guidelines similarly provide that after a qualified employee with a disability has asked for a reasonable accommodation, "the employer must make a reasonable effort to determine the appropriate accommodation," and this accommodation "is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability."  29 C.F.R. Pt. 1630, App. § 1630.9.  Both the employer and employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Taylor v. Phoenixville School Dist., 184 F.3d 296, 312 (3d Cir. 1999) (citation omitted).

"An employer's obligation to provide a reasonable accommodation does not require the employer to create a new job," although "an employer may be required to transfer an employee to an existing position."  Donahue v. Consolidated Rail Corp., 224 F.3d 226, 230 (3d Cir. 2000).  An employee who claims that the employer discriminated against her by failing to make a reasonable accommodation cannot recover without showing that such an accommodation was possible.  Id. at 234.  Thus, an employee claiming that her employer failed to reasonably accommodate her by transferring her to an open position meets her litigation burden with respect to both "actual" and "regarded as" disability claims by showing "(1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation."  Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 770 (3d Cir. 2004) (citing Donahue, 224 F.3d at 230).  "If the employee meets h[er] burden, the employer must demonstrate that transferring the employee would cause unreasonable hardship."  Id.

With respect to a transfer to 2012 Chestnut, Andino would have to show a "vacant, funded position" existed there when she allegedly needed it.  PHA asserts there was no such permanent position there during Andino's chosen shift.  Andino contends she satisfies her Williams burden through the testimony of Sergeant Jones, Stacey Thomas, and Sergeant Cunningham.

Sergeant Jones said the largest number of police officers he ever had working on light duty in the radio room was "[m]aybe four" and that there were "times" when the second and

29

third shift was not covered there.  He did not in any meaningful
way specify when those times were (e.g., a specific month or
year), so as to show whether a position might have been available
at any time relevant to our inquiry, such as mid-2004 until late
November 2005.  We also do not know when "maybe four" officers
worked there on light duty, nor is that relevant to whether there
was a vacant, funded position when Andino might have filled it.
As to Thomas, she said that PHA assigned twenty to thirty people
to light duty in a five-year span, but, again, that information
says nothing about whether there was a vacant spot when Andino
might have used it or whether it was at or below her level.
Finally, Sergeant Cunningham testified that since November of
2005 PHA employees have worked all three shifts in the radio
room.  Cunningham Dep. 48:18-24.  That information is immaterial.
Andino did not need a 2012 Chestnut position after November 2005
because PHA accommodated her with light duty positions after her
second injury and until she went out for her right shoulder
surgery, after which time she never requested a return to work.

        Because of insufficient record evidence to create a
material dispute as to the first element -- a "vacant, funded
position" -- we need not reach the other factors.  Andino cannot
satisfy the Williams standard.

        The record also cannot support Andino's contention that
writing was not an essential function of her job.  The position
descriptions for lobby monitors specify writing requirements,
lobby monitors most often worked alone,[13] and PHA indubitably

---

        [13] PHA contends that while two lobby monitors work
together occasionally, it would not be feasible to permanently
                                                (continued...)

enforced this requirement (<u>i.e.</u>, by sending Andino home when
Sergeant Cunningham believed she could not write).

      Finally, Andino contends that even if writing were an
essential function of her job, there is evidence that certain
accommodations could have permitted her to write.  She cites the
ADA expert report of Sharon Levine, who opined that Andino could
have been trained to write with her non-dominant right hand using
thick pens that are easier to grasp and relieve tension, and
through physical therapy or rehabilitation of that arm.  <u>See</u>
Levine Report 5-6.

---

[13](...continued)
assign Andino to a position with another monitor to ensure she
fulfills her job duties.  Andino states that when two lobby
monitors work together they can decide how to allocate work.
Andino posits that one person can take on all the writing duties
for her co-worker, as Sandra Young did for her once, so
"[t]ogether, [two people] performed all of the essential
functions of the job."  Pl.'s Resp. 31.

      As proof that lobby monitors "frequently" work
together, she submits the lobby monitor work schedule for twelve
people, including herself, working the 3:00 p.m. to 11:00 p.m.
shift at six facilities for a six-week period.  <u>See</u> Pl.'s Resp.
31, Ex. L Lobby Monitor Schedules (year not given).  She submits
no documents showing how many lobby monitors PHA employed during
that time or how many buildings PHA assigned them to.

      In the absence of any contrary instructions, we assume
that the numerical designation each employee has for each day is
the street address of his or her assignment.  The samples show a
pattern: most of the time lobby monitors worked alone.  On
average, two facilities had two people, although not always the
same two facilities.  Also, all of the employees were moved
around regularly, and no one was assigned to only one location.
Thus, the most Andino's limited sample shows is that lobby
monitors were constantly shuffled between buildings and most of
the time they worked alone.  That being the case, this does not
contradict that writing was indeed a job requirement.

When Andino called Thomas in HR twice in 2004, she told Thomas that "stiffness and pain to [her left] elbow" prevented her from writing and working full duty.  Andino Dep. 183:1-2.[14] She did not tell Thomas that cramping and pain in her right arm prevented her from using that hand to write.  Indeed, the July 28, 2004 full duty release from the doctor who examined Andino stated that she "demonstrate[d] the ability to write with her right hand."  Letter Report of Dr. Kirkpatrick.  The interactive process requires good faith participation from both the employer and the employee.  In the face of (a) a full duty release from a doctor stating she could write, (b) no contrary medical evidence, and (c) no notice from Andino of any writing limitation with the right hand, PHA was not on notice that she was a disabled employee with a limitation preventing her from performing the essential functions of her job and that she required accommodation.[15]

---

[14] Andino's affidavit provides more detail about what she said during these conversations than her deposition does. Compare Andino Aff. ¶ 27 with Andino Dep. 182:7-184:16.  We shall not consider any new post-deposition allegations on this point. See Baer v. Chase, cited and discussed in note 2, supra.  The deposition transcript shows that PHA's counsel asked Andino about the conversations and gave her a full and fair opportunity to describe them.  Under these circumstances, she cannot wait until she is beyond the reach of PHA's counsel's cross-examination to fashion a better answer.

[15] Notably, after the right shoulder injury and upon receipt of many "light duty" doctors' notes, PHA did in fact accommodate Andino by keeping her on light duty status until she left in July of 2006 pursuant to a doctor's notes sending her home before the surgery.  Although the surgery was postponed, Andino never returned to work.  She makes no representation that
(continued...)

In sum, all of Andino's arguments with respect to the second prong of a _prima_ _facie_ discrimination case fail.

## III.  **Conclusion**

For the reasons discussed herein, we shall grant defendant's motion for summary judgment.[16]


BY THE COURT:


/s/ Stewart Dalzell, J.

---

[15](...continued)
she ever contacted PHA about working from that point forward, nor that she requested an accommodation to return to work.  Thus, after the July 2006 doctor's note and Andino's departure from work, PHA had no reason to believe that she was even willing to work, with or without an accommodation, and therefore had no duty to seek to accommodate her.  The interactive process requires both parties to act in good faith in searching for a reasonable accommodation.  It is unclear from Andino's brief if she makes an "interactive process" argument for the mid-2006 through early 2007 period, but if she does, the record simply cannot sustain such a claim for that period.

[16] We are grateful to Stephen Springer, Esq., who accepted our appointment to represent this plaintiff, and did so with great patience and zeal.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NINA ANDINO                     :      CIVIL ACTION
                                :
          v.                    :
                                :
PHILADELPHIA HOUSING            :
AUTHORITY                       :      NO. 05-2161

<u>ORDER</u>

          AND NOW, this 6th day of August, 2007, upon
consideration of defendant's motion for summary judgment,
plaintiff's response thereto, and defendant's reply, and in
accordance with the accompanying Memorandum, it is hereby ORDERED
that:

          1.   Defendant's motion is GRANTED; and
          2.   The Clerk shall CLOSE this case statistically.


                              BY THE COURT:


                              <u>/s/ Stewart Dalzell, J.    </u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NINA ANDINO                    :    CIVIL ACTION
                               :
        v.                     :
                               :
PHILADELPHIA HOUSING           :
AUTHORITY                      :    NO. 05-2161

<u>JUDGMENT</u>

AND NOW, this 6th day of August, 2007, for the reasons articulated in the accompanying Memorandum and Order, JUDGMENT IS ENTERED in favor of defendant Philadelphia Housing Authority and against plaintiff Nina Andino.


BY THE COURT:


<u>/s/ Stewart Dalzell, J.</u>